## SAM v. SAM et al.

No. 25438.    May 21, 1935.

W. A. Corley, W. L. Chase, and A. C. Brewster, for plaintiff in error.

W. E. Nicklin, J. Howard Langley, and Harve N. Langley, for defendants in error.

PER CURIAM. This appeal presents for consideration a decree rendered by the district court of Mayes county upon a trial de novo, which adjudged the nonheirship of Juanita Sam, an alleged child of Josiah Sam, a Cherokee Indian, the deceased.

The first and second assignments relate to the submission and form of the verdict; the fourth and fifth to instructions, and the remaining involve a consideration of the evidence.

The petition for the determination of heir-

ship, originally filed in the county court, alleges that Josiah Sam, on December 25, 1930, left surviving him the petitioners, Josiah, Jr., Rider and Harry Sam, and further alleges that Juanita Sam claims some interest in the estate. To the petition Juanita responds, claiming that Josiah Sam was her father and Annie Sam, now Annie Soap, her mother; that Josiah and Annie were husband and wife; so lived and cohabited together in 1911-12, before the birth of respondent, and that she is a legitimate child of the deceased. The decree rendered being adverse to her claim of heirship, Juanita appeals to this tribunal.

The proceedings, involving matters in probate, are equitable in their nature, and will be so treated by this tribunal.

"In probate matters, where an appeal is taken * * * to the district court on questions of fact, or, on question of both law and fact, the trial * * * must be de novo, and shall be conducted in the same manner as if the case and proceedings had lawfully originated in that court; and such appellate court has the same power to decide the questions of fact which the county court or judge had * * * and on appeal to this court from the judgment of the district court in probate matters the entire record will be examined, and this court will render, or cause to be rendered, such judgment as should have been entered on the trial of the case." Tilman v. Tilman, 74 Okla. 259, 177 P. 558; Bilby v. Stewart, 55 Okla. 767, 153 P. 1173; Parker v. Hamilton, 49 Okla. 693, 154 P. 65; State v. Nieuwenhuis (S. D.) 207 N. W. 77; Am. Law of Administration (3rd Ed.) vol. 1, p. 506.

The litigants and practically all of the witnesses are Cherokees, and many of them testified with the assistance of an interpreter.

The appellant, to sustain her alleged heirship, seeks to establish that the relation which existed between her parents, Josiah and Annie, in 1911-12, constituted a common-law marriage.

In determining as to whether or not there existed a common-law marriage, the courts are obliged to keep in mind the distinction between the facts to be established and the method of establishing it.

The record reflects the testimony of 15 or more witnesses in behalf of the appellant. The direct or positive testimony as distinguished from negative, which is of less value, is in substance as follows:

Muskrat, a member of the tribe and a former companion of Josiah and Annie, says, in substance:

"I had a conversation with Josiah with reference to Annie * * * of their living together as husband and wife * * * yes, prior to their living together * * * Josiah requested me to talk to Annie for him, as he wanted Annie for his wife. * * * I talked to her. * * * She agreed. * * * They lived together after this for something like a year. * * * Annie gave birth to a child."

Annie, the mother of Juanita, testified, in substance:

"Josiah wanted to live with me * * * when he talked I agreed (Oct. 11, 1911). * * * We stayed at John Duncan's, a brother, something like a year. * * * Lived in the room there, slept together. * * * Yes, together as husband and wife. * * * Juanita was born March, 1913, as the result of our so living together. * * * Q. You spoke about going to get married or license or something * * * when did you speak about it? A. About four months following there was some kind of an order from officers to get married about that time, you know license * * * that is how got to talking about it. * * * Yes, had agreement with Josiah in October. * * * Agreed to live together * * * never slept together before agreement. * * * Parents when we went to their homes, received us as husband and wife. * * * They prepared bed for us."

We find from the evidence that Josiah and Annie were companions, and as such so associated together in the same neighborhood, were together going to and from church, and at the habitation of her brother, so as to naturally render their subsequent conduct consistent with the traditions of their tribe and with their personal conception of the relation of husband and wife. So far as these young Cherokees were personally concerned, there was a meeting of their minds, an alliance mutually regarded by them as an agreement to be man and wife. In addition, the appellant's contention is supported by the testimony of a dozen or more Cherokee witnesses, who as neighbors and associates regarded these young Indians as husband and wife, and testified that such was their reputation among the inhabitants of the community with whom they came in more constant contact.

To meet appellant's showing in the above respects, appellees introduce the testimony of about the same number of witnesses, some of whom, had the matrimonial situation among the Cherokees been normal during the years of 1911-12, might have been expected to know of the character of the relations of the young Josiah and his alleged girl wife. These witnesses testify in

effect 'that they did not know that Josiah and Annie were married; whether the witnesses so testifying had in mind a "ceremonial marriage" as distinguished from the status recognized by the courts as a "common-law marriage," and limited their testimony to the former, is not entirely free from doubt. Other witnesses presented by the appellees testified 'that they did not know of the young couple living together. The brother of Josiah so testifies, but discloses that Josiah was absent from home and down at John Duncan's about the time of the alleged marriage. The witness says, "Josiah ranged down in that community * * * stayed at John Duncan's, so rangedl there in that neighborhood." The period of time during which Josiah so ranged in the immediate vicinity of Annie's home is extended by additional evidence appearing in the record.

That conditions in Adair county in 1911-12 were not such as to encourage the publication or permanency of matrimonial alliances, other than statutory ones, is evidenced by the testimony of the 'then prosecuting attorney. This ex-official says:

"I directed the arrest of persons who were living together without getting a license. * * * We would file 'open and notorious adultery cases' in the J. P. court, and dismiss the cases as soon as they got a license. * * * This applied to Cherokees living by agreement as husband and wife."

Annie, in referring to the agreement or conversation which resulted in their relations, says: "We didn't aim for anybody to know about it." Nor is it strange that, during the prosecuting attorney's warfare against "agreement marriages," some months after joining and living together as man and wife, these young Cherokees, notwithstanding their then legitimate relations, should then talk of getting married the "white man's way," and still later, laboring under misapprehensions of the law and of their then marital relations, they are impressed that they must separate, and accordingly Josiah and Annie, submissive and uneducated, after peacefully so cohabiting for a year or more and about four months before the birth of the child, left their habitations. Annie is returned to her mother's home by Josiah. He assures her "when babe is born he would help." Fate thus assigned the child, yet unborn, to the care of an abandoned mother and an unhappy wanderer.

Josiah leaves, but subsequently returns and visits 'the young mother and child, and

at very irregular intervals for a period of years occasionally provides some wearing apparel, shoes and such articles for the young daughter. He also sought, without success, permission of the mother for the temporary custody of the daughter. The parents of the child, after the expiration of a number of years, were each subsequently married to their respective spouses of later years.

The case in the court below was submitted to a jury of six, but so submitted by the trial court in its statement of the issues as to convey the impression that the jury, by its verdict, were to determine whether Juanita, the respondent, or the three petitioners should inherit the estate. The form of the verdict submitted and returned read:

"We, the jury * * * do upon our oaths find for the petitioners, Josiah Sam, Jr., Rider Sam and Harry Sam, minors."

To the reception of the verdict exceptions were noted. The question "Was there a common-law marriage between Josiah Sam and Annie Duncan?" accompanies the instructions. This question was returned, with the verdict, unanswered. The decree recites:

"That 'the jury was by the court polled * * * and each juror thereupon was by the court asked if he had found that there was no common-law marriage, * * * and each juror for himself answered said question in the affirmative. * * * Whereupon said verdict was by the court received and accepted. * * * Said verdict is hereby accep'ed, referred to and adopted by the court and made a part of the findings and judgment of this court."

It is urged that the form of the verdict reflects that 'the deliberations of the jury were limited to deciding whether Juanita Sam should inherit the entire estate or Josiah, Jr., Rider and Harry Sam should inherit the estate. While the above issue was in effect so submitted to and decided by the jury, it was not the issue of fact as distinguished from the issue of law which should have been submitted. In fact, there appears to have been no order, as required by the statute, stating "distinctly and plainly the questions of fact to be tried." Section 1412, O. S. 1931.

It is conceded that under section 1619, O. S. 1931, the three children last mentioned inherit irrespective of the validity or invalidity of Josiah's subsequent marriage. The only question involved in the proceedings in the court below was:

"Did Josiah and Annie assume the rela-

tion of husband and wife pursuant to either an express or implied agreement so to do?"

Without commenting upon the legal propriety of the precedure applied by the trial court in its attempt to correct the report of the jury, we are persuaded, by examining the entire record, including the form of the verdict, that the jury did not comprehend nor decide the essential issues of fact to the extent of being any assistance to the presiding judge in determining the issue involved.

The verdict, instead of being adopted by the trial court, should, under the circumstances, have been disregarded by it in considering the evidence and rendering the decree. The findings of the jury involving probate matters upon a trial de novo are not binding, but only advisory. Bilby v. Steward, 55 Okla. 767, 153 P. 1173; and cases cited, including Shaw v. Shaw (S. D.) 133 N. W. 292.

Counsel for appellees in their brief seek to limit the presumption of legitimacy of marital relations exclusively to the parents of the appellees, and by so limiting seeks to deprive an application of this salutary principle to the former relations of appellant's parents. In so contending, counsel erroneously assume that the presumption of legitimacy does not apply to all the children involved.

This court does not subscribe to the contention that a second marriage, under such circumstances as exist in the case at bar, overcomes the presumption in favor of the legitimacy and issue of a prior marriage. To the contrary, a presumption is created that the former spouse had secured a divorce, which warrants this court in the case at bar to recognize the legitimacy of the issue of the respective marriages.

"When a marriage has been shown in evidence, whether regular or irregular, and whatever the form of the proofs, the law raises a presumption of its legality, not only casting the burden of proof on the party objecting, but requiring him throughout and in every particular plainly to make the fact appear, against the constant pressure of this presumption, that it is illegal and void. Nixon et al. v. Wichita Land & Cattle Co., 84 Tex. 408, 19 S. W. 560. The salutary rule so widely recognized and enforced should a fortiori find lodgment in the courts of this state, where the parties to the marriage relations are all full-blood Indians, unused and unaccustomed to the laws of the whites, and to whom written laws governing their domestic relations were innovations at the time." Chancey v. Whinnery, 47 Okla. 272, 147 P. 1036-38; Lewis v. Lewis, 60 Okla. 60, 158 P. 368; Bishop on Marriage, Divorce & Separation (1st Ed.) vol. 1, sec. 1145; Boulden v. McIntire (Ind.) 21 N. E. 445; Coal Run Coal Co. v. Jones (Ill.) 8 N. E. 865; Nixon v. Wichita Land & Cattle Co. (Tex.) 195 S. W. 560; Howton v. Gilpin (Ky.) 69 S. W. 766.

"The presumption in favor of matrimony is one of the strongest known to the law. * * * 'The law presumes morality and not immorality; marriage and not concubinage, legitimacy and not bastardy.'" Teter v. Teter, 101 Ind. 129.

The record reflects no material purpose, and but a slight effort, to prove the absence of a divorce, decidedly less than required by the rule announced in Chancey v. Whinnery, supra, in which this tribunal decided that the evidence presented therein, though decidedly credible, was insufficient to overcome the "constant pressure" of the presumption of legitimacy. So far as the former marriage, the common-law marriage, which is the contested issue in the case at bar, is concerned, it is clearly proven by both direct and circumstantial evidence, and being so proven, presumptions, if any, inconsistent therewith cease to apply. Litigants are not at liberty to rely upon presumptions against ascertained or established facts. Matter of Matthews, 128 N. Y. S. 537; Lincoln v. French, 105 U. S. 614-617. Nor de we in any respect, after reviewing the whole of the evidence, including the direct testimony of Annie, the child's mother, only in part quoted in appellees brief, subscribe to counsel's interpretation thereof, which is calculated to unjustly reflect upon the conduct of the child's parents previous to their marital relations.

While a previous situation, such as is described by council, if disclosed by evidence in a case, might render it more difficult to establish a contract of marriage, we are not prepared to hold such to be the legal impediment to matrimonial alliances. 38 C. J. p. 1321.

In our opinion the fact that this Indian mother subsequently married, without herself securing a divorce, is not, in view of the presumption indulged in as reflected by the decision above quoted, of controlling influence, nor, when recalling the erroneous impressions so unfortunately communicated during the previous years to the Cherokees as to the legal effects of nonceremonial marriages, is the omission on her part in the above respects of material value in the

346

case at bar in determining the heirship involved.

It is the finding and conclusion of this tribunal that Juanita Sam is the legitimate child of the deceased, and this court, being impressed that the material and available evidence pertaining to the transaction, which occurred almost a quarter of a century ago, is so fully presented in these proceedings, concludes, and it is so ordered, that the judgment of the district court be reversed and the cause remanded, with directions to the trial court to enter a decree adjudging the appellant an heir of the deceased, and as such entitled, with the other heirs, to participate in the distribution of the estate of the deceased father.

The Supreme Court acknowledges the aid of Attorneys C. B. McCrory, E. F. Maley, and G. R. Horner in the preparation of this opinion. These attorneys constituted an advisory committee selected by the State Bar, appointed by the Judicial Council, and approved by the Supreme Court. After the analysis of law and facts was prepared by Mr. McCrory and approved by Mr. Maley and Mr. Horner, the cause was assigned to a Justice of this court for examination and report to the court. Thereafter, upon consideration by a majority of the court, this opinion was adopted.

McNEILL, C. J., OSBORN, V. C. J., and BAYLESS, PHELPS, and CORN, JJ., concur.